Forest2Market, Inc. v. Arcogent, Inc., 2016 NCBC 3.

| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
|---|---|

<table>
<tr><td>STATE OF NORTH CAROLINA<br><br>MECKLENBURG COUNTY</td><td>IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION<br>15 CVS 9547</td></tr>
<tr><td>FOREST2MARKET, INC.,<br><br>          Plaintiff,<br><br>v.<br><br>ARCOGENT, INC.<br><br>          Defendant.</td><td><br><br>ORDER & OPINION ON<br>DEFENDANT'S PARTIAL<br>MOTION TO DISMISS</td></tr>
</table>

{1}   **THIS MATTER** is before the Court upon Defendant Arcogent, Inc.'s ("Arcogent") Partial Motion to Dismiss (the "Motion" or "Motion to Dismiss") Plaintiff Forest2Market, Inc.'s ("F2M") Amended Complaint in the above-captioned case. Having considered Arcogent's Motion, briefs in support of and in opposition to the Motion, and the arguments of counsel at an October 7, 2015 hearing in this matter, the Court hereby **GRANTS** the Motion.

> *Womble Carlyle Sandridge & Rice, LLP, by Hayden J. Silver, III and Marina C. Carreker, for Plaintiff Forest2Market, Inc.*
>
> *Odin, Feldman, & Pittleman, P.C., by David C. Gutkowski, and Moore & Van Allen, PLLC, by Scott M. Tyler and Christopher D. Tomlinson, for Defendant Arcogent, Inc.*

Bledsoe, Judge.

I.

PROCEDURAL AND FACTUAL BACKGROUND

{2}   The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6), but only recites those facts included in the First Amended Complaint that are relevant to the Court's determination of the Motion. *See, e.g.*, *Concrete Serv. Corp. v. Investors Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986).

{3}   F2M is a Delaware corporation operating in North Carolina and is a leading provider of market data and analytics in the wood and fiber industries in the United States, Canada, and Brazil. (Am. Compl. ¶¶ 1, 3.)

{4}    Arcogent is a Delaware corporation operating in Virginia. (Am. Compl. ¶ 2.) Arcogent promotes itself as providing business results specializing in designing, enhancing, and managing business models via applied business analytics. (Am. Compl. ¶ 10.) In late 2012 to early 2013, F2M determined that it needed to implement a next-generation data management and reporting platform in order to improve data flow within its business, minimize IT and coding costs, and increase revenue streams. (Am. Compl. ¶ 8.) F2M approached Arcogent about developing and implementing such a platform. (Am. Compl. ¶ 9.)

{5}    In March of 2013, Arcogent contracted with F2M to investigate F2M's original platform and develop a roadmap for implementing a next-generation product delivery platform for F2M. (Am. Compl. ¶¶ 10–12.) Arcogent subsequently proposed creation of a "single, streamlined, company-wide platform for forestry supply chain reporting and analysis" and represented that Arcogent's methodology and expertise could meet and exceed F2M's goals and requirements for a next-generation platform. (Am. Compl. ¶¶ 14, 17.)

{6}    On March 26, 2013, F2M and Arcogent entered into a Master Services Agreement ("MSA") in which Arcogent agreed to provide various professional services connected with the design and implementation of Arcogent's proposed platform, with the specific tasks and deliverables to be specified and agreed upon in subsequent Statements of Work (the "Project"). (Am. Compl. ¶ 21.)

{7}    On or around October 1, 2013, the parties entered into a Strategic Product Platform Transformation Statement of Work ("Arcogent Platform SOW"), by which F2M would be able to migrate its operations from its original platform to a next-generation Microsoft SQL Server data warehouse and IBM Cognos Business Intelligence-based platform (the "Platform"). (Am. Compl. ¶ 28.) Arcogent estimated that executing the Arcogent Platform SOW would cost $895,600, not including software to be licensed from third parties, and it was obligated to perform specific services under the contract that included oversight and management of Project staffing and providing F2M with status updates regarding the Project. (Am. Compl. ¶¶ 30–31.)

{8} The Arcogent Platform SOW also named Joe Coppola ("Coppola") as Project General Manager—the person "primarily responsible" for ensuring the Project's implementation—and estimated that his services for the entire Project would be a total of 2,080 hours billed. (Am. Compl. ¶¶ 37, 41.) By March 2014, Arcogent purportedly had made little progress toward implementing the new Platform but "had already billed F2M nearly a quarter" of the cost Arcogent estimated for the entire Project. (Am. Compl. ¶¶ 38–39.) At that time, Coppola had already billed F2M for 900 total hours worked, although F2M contends that his oversight resulted in minimal progress and critical mistakes in the process. (Am. Compl. ¶¶ 42–44.)

{9} During a meeting in or around April 2014, F2M raised its concerns about Arcogent's perceived lack of progress relative to its billing, seeking reassurance that the company could deliver the Platform as promised. (Am. Compl. ¶ 47.) The parties specifically addressed Coppola's work as Project General Manager at this meeting because F2M believed that he was either overbilling for work not performed or was incompetent since they saw such minimal advancement relative to F2M's investment in the Project. (Am. Compl. ¶¶ 49–50.)

{10} F2M now alleges that Coppola knowingly submitted fraudulent time sheets from November 2013 to March 2014, which "misrepresented the time, scope and substance" of his work on the Project, and that such misrepresentations led to Arcogent sending F2M invoices containing "false, inflated, and improper charges[.]" (Am. Compl. ¶¶ 51–53.) Because "Arcogent knew or should have known" that Coppola was submitting false time sheets, F2M alleges that the company violated a duty to not provide misleading information by sending invoices to F2M based on Coppola's misrepresentations. (Am. Compl. ¶¶ 54–56.)

{11} After F2M raised its concerns, Arcogent subsequently fired Coppola, and the company also took other steps to salvage the Project. (Am. Compl. ¶¶ 58–60.) The parties agreed to a Change Order on May 29, 2014 that set forth the deliverables required for the first micro-project associated with the Arcogent Platform SOW and altered the billing practices under the contract. (Am. Compl. ¶¶ 60, 63.) The deadline for the completion of the micro-project was initially set for July 31, 2014, but the

deadline was extended multiple times due to Arcogent's inability to deliver. (Am. Compl. ¶¶ 64–68.)

{12} The product associated with the first micro-project under the Arcogent Platform SOW was finally delivered to F2M on December 15, 2014, but the deliverable was allegedly plagued with errors and failed to perform adequately. (Am. Compl. ¶¶ 69–72.) Contrary to Arcogent's promises to rectify this failure and its assurance that it would provide a quality product, F2M alleges that it has only received one product, which it contends is unusable, for only one of the micro-projects pursuant to the Arcogent Platform SOW, despite the company's two-year effort and significant financial investment in the Project. (Am. Compl. ¶¶ 71–72, 76–79.)

{13} F2M filed its Complaint against Arcogent on May 14, 2015, and, in response to an initial motion to dismiss, F2M filed its First Amended Complaint on August 17, 2015. The First Amended Complaint asserts claims for (i) breach of contract, (ii) fraud, (iii) negligent misrepresentation, (iv) negligent supervision, and (v) violation of the Unfair and Deceptive Trade Practices Act, codified at N.C. Gen. Stat. § 75-1.1 *et seq.* ("Chapter 75 claim" or "UDTP claim"). F2M filed the Motion to Dismiss on August 26, 2015. The court held a hearing on the Motion on October 7, 2015, at which all parties were represented by counsel. The Motion is now ripe for decision.

II.

ANALYSIS

A.    Fraud, Negligent Misrepresentation, and Negligent Supervision

{14} Arcogent seeks dismissal of F2M's claims for fraud, negligent misrepresentation, and negligent supervision based on the economic loss doctrine. At the hearing, F2M conceded that its fraud and negligent misrepresentation claims were likely barred by that rule but asserted that its negligent supervision claim should survive Arcogent's Motion.

{15} This Court recently elaborated on the origin and evolution of the economic loss doctrine in North Carolina in *Artistic Southern, Inc. v. Lund*, 2015 NCBC LEXIS 113 (N.C. Super. Ct. Dec. 9, 2015). The rule originated in products liability cases to bar recovery in tort for purely economic loss arising out of a defective product. *Artistic*

*Southern*, 2015 NCBC LEXIS 113, at *21. The doctrine has gained a broader reach because it arises from the principle that "'[o]rdinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor.'" *Id.* (quoting *N.C. Ports Auth. v. Lloyd A. Fry Roofing Co.*, 294 N.C. 73, 81, 240 S.E.2d 345, 350 (1978)). North Carolina courts, therefore, generally recognize that

> a tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to properly perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract.

*Spillman v. Am. Homes of Mocksville, Inc.*, 108 N.C. App. 63, 65, 422 S.E.2d 740, 741–42 (1992). *See also Strum v. Exxon Co., USA*, 15 F.3d 327, 330 (4th Cir. 1994) (applying North Carolina law and reasoning that "[p]arties contract partly to minimize their future risks. Importing tort law principles of punishment into contract undermines their ability to do so.").

{16} The economic loss doctrine today generally limits recovery in tort "when a contract exists between the parties that defines the standard of conduct and which the courts believe should set the measure of recovery." *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *47–48 (N.C. Super. Ct. Nov. 3, 2011). Flowing from this rule, in order to maintain tort claims for conduct also alleged to be a breach of contract, a plaintiff must identify a duty owed by the defendant "separate and distinct from any duty owed under a contract." *Id.* (quoting *Kelly v. Ga. Pac., LLC*, 671 F. Supp. 2d 785, 791 (E.D.N.C. 2009)).

{17} The economic loss rule, therefore, will bar F2M's tort claims if the allegedly offending conduct is also a breach of the parties' contract and Plaintiff fails to identify a duty separate and distinct from F2M's contractual obligations.

{18} F2M identifies its "contract or contracts" with Arcogent as the "Master Services Agreement and the preceding and subsequent statements of work." (Am. Compl. ¶ 81.)[1] F2M premises all of its tort claims on Coppola's allegedly deceptive

[1] Arcogent attached the Master Services Agreement and the Strategic Product Platform Transformation Statement of Work to its Motion to Dismiss. "When ruling on a Rule 12(b)(6) motion,

overbilling and Arcogent's role in conveying these invoices to F2M. (Am. Compl. ¶¶ 92, 102, 112.) Unsurprisingly, the parties' contract explicitly addresses billing and staffing. The Master Services Agreement specifically provides that "Arcogent shall prepare and submit to [F2M] written monthly invoices showing the compensation due for work performed." (Def.'s Mem. Supp. Mot. Dismiss Ex. A, hereinafter "MSA," Art. 8(C).) The Arcogent Platform SOW further states that "Arcogent will invoice [F2M] only for the Services actually rendered and the expenses actually incurred." (Def.'s Mem. Supp. Mot. Dismiss Ex. B, hereinafter "Arcogent Platform SOW," § 1.4.) Each party additionally held the right, under the terms of the contract, to replace any Project Manager by written notice. (MSA Art. 2.) In light of the numerous provisions setting out the parties' rights and obligations regarding billing, the Court concludes that the terms of the negotiated contract embrace the allegations surrounding Coppola's alleged overbilling.

{19} F2M's claim for negligent supervision also contends that Arcogent's failure to supervise Coppola adequately enabled his overbilling and Arcogent's failure to deliver a suitable product. (Am. Compl. ¶ 107.) This allegation, however, also describes a breach of the parties' contract, as Arcogent represented that it would "[m]anage and oversee day-to-day project activities for the project team[, and] . . . oversee and manage [Arcogent and F2M] staffing and tasks." (Arcogent Platform SOW § 1.2.1.)

{20} In support of its negligent misrepresentation claim, F2M further asserts that Arcogent represented its capability to meet F2M's goals and that Arcogent allegedly knew or should have known it could not do so. (Am. Compl. ¶ 97–98.) The Arcogent Platform SOW, however, lays out a detailed and strategic process—nearly three pages of itemized representations from the design phase through delivery—for building a product suited to F2M's needs. (Arcogent Platform SOW § 1.1.) Since the parties defined the scope of Arcogent's performance by contract, a failure to perform

a court may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001).

the contracted-for services is properly alleged as a breach of their contract. *See, e.g.*, *Supplee v. Miller-Motte Bus. College, Inc.*, 768 S.E.2d 582, 593 (N.C. Ct. App. 2015) (defining a material breach of contract as a substantial failure to perform).

{21}  Accordingly, because the breach of contract claim encompasses the conduct underlying F2M's tort claims, the economic loss rule applies and will bar F2M's tort claims absent allegations of an independent and identifiable duty owed by Arcogent.

{22}  F2M argues that Arcogent owed a "duty not to provide deceptive or misleading information" that is separate and distinct from any contractual duties owed.  (Pl.'s Opp. Mot. Dismiss 8.)  The two cases that F2M cites in support of its argument, however, discuss the existence of such a duty only in instances of fraudulent inducement. *Schumacher Immobilien Und Beteiligungs AG v. Prova*, No. 1:09cv00018, 2010 U.S. Dist. LEXIS 107526, at \*5 (M.D.N.C. Oct. 7, 2010) (applying North Carolina law and discussing a contracting party's duty not to provide false information to induce the execution of a contract); *Ada Liss Group v. Sara Lee Corp.*, No. 06CV610, 2010 U.S. Dist. LEXIS 59691, at \* 35 (M.D.N.C. Apr. 27, 2010) (applying North Carolina law and holding that the defendant owed a duty not to provide deceptive or misleading information where ample evidence suggested a fraudulent scheme to induce the plaintiff into signing a settlement agreement). Because F2M alleges that the parties were performing under the contract when the purportedly tortious conduct occurred, the Court concludes that Arcogent did not owe F2M a separate and distinct duty not to provide deceptive and misleading information in these circumstances. *See Wireless Communs., Inc. v. Epicor Software Corp.*, No. 3:10CVS556-DSC, 2011 U.S. Dist. LEXIS 2633, at \*13–14 (W.D.N.C. Jan. 10, 2011) (applying North Carolina law and distinguishing *Schumacher* and *Ada Liss* as fraudulent inducement cases that did not create a separate and distinct duty to prevent dismissal under the economic loss rule).

{23}  Absent allegations of other separate and distinct duties sufficient to support its tort claims, F2M's assertion of fraud, negligent misrepresentation, and negligent supervision claims appears, at root, to be an attempt "to manufacture a tort dispute out of what is, at bottom, a simple breach of contract claim." *Strum*, 15 F.3d at 329.

Such attempts are "inconsistent both with North Carolina law and sound commercial practice." *Id.*; *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 346 (4th Cir. 1998) (applying North Carolina law). The Court therefore concludes that F2M's claims for fraud, negligent misrepresentation, and negligent supervision should be dismissed with prejudice.

B.     Unfair and Deceptive Trade Practices

{24}   To state a claim for unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1 *et seq.* ("Chapter 75"), "a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). In support of its Chapter 75 claim, Plaintiff alleges that Arcogent "was obliged to bill F2M only for work actually performed on the Project" and that, by overbilling, Arcogent "fraudulently misrepresented the scope of services actually performed." (Am. Compl. ¶¶ 118–19.) F2M claims that it suffered injury at Arcogent's hands because F2M "reasonably relied on the inaccurate billing statements." (Am. Compl. ¶ 120.)

{25}   It is "well recognized . . . that actions for unfair or deceptive trade practices are distinct from breach of contract" and that a party's breach of contract, "even if intentional, is not sufficiently unfair or deceptive to sustain an action under [Chapter 75]." *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992). A party must therefore show "substantial aggravating circumstances" accompanying the breach of contract to sustain its Chapter 75 claim. *Id.*; *see Griffith v. Glen Wood Co.,* 184 N.C. App. 206, 217, 646 S.E.2d 550, 558 (2007).

{26}   F2M argues that it has alleged unfair and deceptive conduct outside the scope of the parties' contract, including Arcogent's and Coppola's knowing submission of inaccurate invoices, Arcogent's alleged concealment of the overbilling, and Arcogent's supposed knowledge that it could not deliver a final product as represented. (Pl.'s Opp. Mot. Dismiss 15.) However, as discussed above, the Amended Complaint's allegations of wrongdoing address rights and obligations owed under the contract. Thus, the question before the Court is whether the Amended

Complaint sufficiently alleges substantial aggravating circumstances to bring Arcogent's alleged breach of contract into the exception to the general rule that a mere breach of contract is insufficient to support a Chapter 75 claim. *E.g.*, *Flanders/Precisionaire Corp. v. Bank of N.Y. Mellon Trust Co.*, 2015 NCBC LEXIS 36, at \*38 (N.C. Super. Ct. April 7, 2015).

{27} Conduct typically held to constitute sufficient aggravating circumstances under Chapter 75 "generally involve[s] forged documents, lies, and fraudulent inducements." *Stack v. Abbott Labs., Inc.*, 979 F. Supp. 2d 658, 668 (M.D.N.C. 2013). *See e.g.*, *Garlock v. Henson*, 112 N.C. App. 243, 246, 435 S.E.2d 114, 115 (1993) (holding that defendant's forged bill of sale and continual deception for three years to deprive plaintiff of money to which he was entitled amounted to substantial aggravating circumstances); *Sparrow Sys. v. Private Diagnostic Clinic, PLLC*, 2014 NCBC LEXIS 70, at \*44–45 (N.C. Super. Ct. Dec. 24, 2014) (concluding that plaintiff alleged more than a mere breach of contract where the complaint alleged deceitful conduct including the procurement of plaintiff's proprietary information under the false pretense of "quality control").

{28} F2M contends that the allegations of Coppola's knowing and intentional overbilling and Arcogent's subsequent intentional concealment constitute sufficient aggravating circumstances to permit its Chapter 75 claim to survive. (Pl.'s Resp. Opp. Mot. Dismiss 15.) As a general rule, however, where, as here, the parties' contract required the defendant to only bill for services rendered, a plaintiff's allegations of overbilling will usually amount to, at most, an intentional breach of contract. *See, e.g.*, *Phelps Staffing, LLC v. C. T. Phelps, Inc.*, 226 N.C. App. 506, 512–13, 740 S.E.2d 923, 928–29 (affirming trial court's conclusion that allegations of fraudulent billing amounted to nothing more than a billing error and were not substantially aggravating circumstances); *Boyd v. Drum*, 129 N.C. App. 586, 593, 501 S.E.2d 91, 97 (1998), *aff'd*, 350 N.C. 90, 511 S.E.2d 304 (1999) (holding that defendants failure to pay plaintiffs pursuant to a promissory note was not "substantially aggravating" to support Chapter 75 claim); *Flanders/Precisionaire Corp.*, 2015 NCBC LEXIS 36, at \*38 (dismissing defendant's UDTP counterclaim as

an intentional breach of contract where plaintiff allegedly reduced rental payments, purported to terminate leases, and concealed those actions from defendant).

{29} To avoid this result, F2M specifically asks the Court to consider *F. Ray Moore Oil Co. v. State* in support of its contention that Arcogent's alleged overbilling in breach of the parties' contract is sufficient to support F2M's UDTP claim. 80 N.C. App. 139, 141–42, 341 S.E.2d 371, 373 (1986). In that case, the court upheld a UDTP counterclaim against the plaintiff, which made various misrepresentations and overbilled in violation of its contract to supply oil to the state. *Id.* F2M argues that this case stands for the proposition that overbilling in breach of a contract of the sort alleged here can rise to the level of substantial aggravating circumstances.

{30} The Court does not find *F. Ray Moore* controlling. First, the plaintiff's argument in *F. Ray Moore* centered on its interpretation of the contract at issue and its contention that its acts were actually not a breach. *Id.* at 141–42, 341 S.E.2d at 373. On appeal from a bench trial, the plaintiff challenged the trial court's conclusion that plaintiff had breached the contract, and the plaintiff did not argue to the Court of Appeals that its mere breach of contract was an insufficient basis for the UDTP claim. Hence, the court in *F. Ray Moore* did not squarely address the argument that F2M uses the case to advance. Furthermore, the sole case that has subsequently relied on *F. Ray Moore* cites it for a different point of law. The Court, therefore, does not believe that this case compels a conclusion that Arcogent's conduct amounted to substantially aggravating circumstances.

{31} F2M further argues that it has alleged more than an intentional breach of contract because it contends that Arcogent intentionally concealed Coppola's overbilling. (Pl.'s Opp. Mot. Dismiss 15.) The Court disagrees.

{32} First, F2M advances only conclusory allegations that Arcogent knew of Coppola's overbilling when invoicing F2M. (Am. Compl. ¶ 59.) *See, e.g., Global Promotions Grp., Inc. v. Danas Inc.*, 2012 NCBC LEXIS 40, at *12 (N.C. Super. Ct. June 22, 2012) ("Absent specific, supportive, factual allegations, the court need not accept as true general conclusory allegations of the elements of a cause of action for purposes of a motion to dismiss.").

{33}   In addition, the Amended Complaint states in more detail that F2M raised its concerns about Coppola and his billing practices in a meeting with Arcogent, (Am. Compl. ¶ 50), after which Arcogent subsequently terminated Coppola and took other steps to salvage the Project.  (Am. Compl. ¶¶ 57–58.)  Taking these allegations as true, the Court concludes that Arcogent's attempts to remedy Coppola's overbilling overcome F2M's claim that the alleged concealment of Coppola's overbilling is a substantially aggravating circumstance sufficient to support the UDTP claim. *See, e.g.*, *Mitchell v. Linville*, 148 N.C. App. 71, 76, 557 S.E.2d 620, 624 (2001) (affirming no substantial aggravating circumstances existed where defendants openly acknowledged their failure to deliver at closing and attempted to replace defective products).

{34}   Further, even if F2M had alleged specific facts showing that Arcogent knew it was submitting inaccurate invoices, F2M has not alleged facts suggesting that these acts were deceptive rather than an intentional breach of a negotiated contract. *See James R. Carcano v. JBSS, LLC*, 200 N.C. App. 162, 172, 684 S.E.2d 41, 50 (2009) ("In determining the unfair or deceptive nature of an act or practice, each case is fact specific, and such determination depends upon the "'impact the practice has in the marketplace.'") (citation omitted)

{35}   F2M also contends that it has alleged sufficient aggravating circumstances to support its Chapter 75 claim because Arcogent "knew or should have known that it was incapable" of meeting the goals of the Arcogent Platform SOW.  (Am. Compl. ¶ 115–17.)  Allegations that a party entered into a contract with no intent to perform may support a Chapter 75 claim. *Wells Fargo Bank, N.A. v. Corneal*, 767 S.E.2d 374, 378 (N.C. Ct. App. 2014). *See also Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond, Charlotte Branch*, 80 F.3d 895, 903 (4th Cir. 1996) ("[A] broken promise is unfair or deceptive only if the promisor had no intent to perform when he made the promise.").

{36}   F2M, however, has only alleged that Arcogent "knew or should have known" it could not deliver the Platform as promised.  This falls short of an allegation that F2M had no *intent* to perform under the contract,  and so the Court concludes that

Arcogent's alleged inability to perform is at most a mere "broken promise," and therefore insufficient to support F2M's UDTP claim. *See, e.g., Corneal*, 767 S.E.2d at 378 ("[W]e hold that defendants' allegation that plaintiff broke its promise, standing alone, does not constitute a [UDTP] claim."); *Opsahl v. Pinehurst, Inc.*, 81 N.C. App. 56, 70, 344 S.E.2d 68, 77 (1986) (holding that the representation of projected completion dates "as firm when in fact they are not" did not give rise to UDTP claim).

{37} Based on the above, the Court concludes that F2M's Amended Complaint fails to allege the required aggravating circumstances accompanying Arcogent's alleged breach of contract to support F2M's UDTP claim. As such, F2M's claim under Chapter 75 is essentially a claim for intentional breach of contract and should therefore be dismissed with prejudice.

III.

CONCLUSION

{38} For the foregoing reasons, Defendants' Motion to Dismiss is hereby **GRANTED**.

{39} Plaintiff's claims for fraud, negligent misrepresentation, negligent supervision, and violation of N.C. Gen. Stat. § 75-1.1 *et seq.* are hereby **DISMISSED** with prejudice.

**SO ORDERED**, this the 5th day of January, 2016.


/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases